## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| GENERAL INSURANCE COMPANY OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CV 2787 |
| | ) | |
| CLARK MALL CORP. d/b/a DISCOUNT MEGA | ) | Judge Guzman |
| MALL CORP., MARCOS I. TAPIA, JUAN E. | ) | |
| BELLO, JOSE L. GARCIA, LETICIA HURTADO, | ) | Magistrate Judge Ashman |
| YOUNG S. KO, MARIANO KON, CHOONG I. | ) | |
| KUAN, ROSA G. MADRIGAL, HILDA | ) | |
| MENDOZA, MAN OK NO, HEE T. PARK, | ) | |
| SUNG W. PARK, MARIA L. ROMAN, | ) | |
| VICTOR H. VISOSA, KYUN HEE PARK and | ) | |
| JENNIFER PARK, | ) | |
| Defendants. | ) | |

### MOTION TO STRIKE ARGUMENT
### FIRST RAISED IN DEFENDANTS' REPLY BRIEF

Plaintiff, General Insurance Company of America ("General)", by and through its attorneys, moves to strike the new argument raised in defendants Discount Mega Mall, Corp., Jennifer Park and Kyun Hee Park's reply in support of its motion for judgment on the pleadings, and in support thereof states:

1.      On July 18, 2008 defendants Discount Mega Mall, Corp., Jennifer Park and Kyun Hee Park (collectively "Defendants") filed their motion for judgment on the pleadings.

2.      On August 20, 2008, General filed its response.

3.      On September 3, 2008, Defendants filed their reply in support of their motion for judgment on the pleadings. In their reply brief, Defendants *for the first time* raised the argument that a finding that the care, custody and control exclusion would require the Court to determine factual issues crucial to the Defendants liability in the underlying lawsuit, thus entitling Defendants to a finding that General is required to defend them in the underlying suit.

## *ARGUMENT*

4.　　A moving party may not raise new issues in its reply brief.  See Fasules v. D.D.B. Needham, Worldwide, Inc., 1989 WL 105264 (N.D. Ill., Sept. 7, 1989); Carnes v. MCI Telecommunications Corp., 1997 WL 767013 (N.D. Ill., Dec. 4, 1997).  This rule stems from a fundamental principle of fairness—plaintiffs should not be subject to summary judgment on issues which they have not have a chance to respond to.  See Fasules, supra.  (Copies of cases cited are attached as Exhibit A to this Motion to Strike).

5.　　The proper remedy for striking factual claims and supporting evidence is striking the reply brief.  See Ace Novelty Co., Inc. v. Vijuk Equipment, Inc., 1991 WL 150191 (N.D.Ill., July 31, 1991).

6.　　In their Motion for Judgment on the Pleadings, Defendants argued that the facts as pled did not establish the application of the care, custody and control exclusion.  Defendants did not argue that that a finding that the care, custody and control exclusion would require the Court to determine factual issues crucial to the Defendants liability in the underlying lawsuit, thus entitling Defendants to a finding that General is required to defend them in the underlying suit

7.　　In their Reply in Support of their Motion for Judgment on the Pleadings, for the first time, Defendants argued that a finding that the care, custody and control exclusion would require the Court to determine factual issues crucial to the Defendants liability in the underlying lawsuit, thus entitling Defendants to a finding that General is required to defend them in the underlying suit.

8.　　Had Defendants wished to move for judgment on the basis that a finding that the care, custody and control exclusion would require the Court to determine factual issues crucial to the Defendants liability in the underlying lawsuit, they should have moved for this in their

motion for judgment on the pleadings. They did not. Accordingly, Defendants argument that that a finding that the care, custody and control exclusion would require the Court to determine factual issues crucial to the Defendants liability in the underlying lawsuit, should be stricken and not relied upon by this Court in reaching its decision on Defendant's Motion for Judgment on the Pleadings.

WHEREFORE, General Insurance Company of America prays this Court grant its motion to strike Defendants' argument first raised in its reply brief that Defendants are entitled to judgment on the pleadings because that a finding that the care, custody and control exclusion would require the Court to determine factual issues crucial to the Defendants liability in the underlying lawsuit.

Respectfully submitted,

GENERAL INSURANCE COMPANY OF AMERICA

_____ s/Mary K. Cryar _____

William K. McVisk, ARDC #1871307
Mary K. Cryar, ARDC #06279042
Johnson & Bell, Ltd.
33 West Monroe Street, Suite 2700
Chicago, IL 60603
Telephone: (312) 372-0770
Fax: (312) 372-9818
E-mail: mcviskw@jbltd.com
        cryarm@jbltd.com
#1931116

LEXSEE 1991 U.S. DIST. LEXIS 10713

**ACE NOVELTY CO., INC. Plaintiff, v. VIJUK EQUIPMENT, INC. and JOSEPH M. VIJUK, Defendants. VIJUK EQUIPMENT, INC. and JOSEPH M. VIJUK, Counterplaintiffs, v. ACE NOVELTY CO., INC., WILLIAM LOREN GREENWOOD, and TRADE PRODUCTS, INC., Counterdefendants**

**No. 90 C 3116**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

**1991 U.S. Dist. LEXIS 10713**

**July 30, 1991, Decided**
**July 31, 1991, Docketed**

**JUDGES:** [*1] Charles P. Kocoras, United States District Judge.

**OPINION BY:** KOCORAS

**OPINION**

*MEMORANDUM OPINION*

This matter is before the court on four motions. Counterdefendants Ace Novelty Co., Inc. ("Ace"), Trade Products, Inc. ("TPI"), and Loren Greenwood ("Greenwood") have filed two motions which attack the timeliness, venue, designation, and sufficiency of various portions of the counterclaim. Greenwood, an employee of Ace, has individually filed a third motion asserting that the fiduciary shield doctrine protects him from suit in this forum. These motions were fully briefed on June 20, 1991. On July 10, 1991 the counterclaimants moved to strike the counterdefendants' reply memoranda for improper addition of new facts and legal arguments. In the alternative, the defendants ask leave to file sur-replies in response to the new issues. As discussed below, the counterdefendants' reply briefs are stricken. In addition, Greenwood is dismissed from the case, as are Counts I, VI and VII. The counterdefendants' objections as to the counterclaim's timeliness and the propriety of venue are, however, rejected.

*BACKGROUND*

Ace initiated this litigation on May 31, 1990, alleging that the defendants, Vijuk Equipment, [*2] Inc. and Joseph Vijuk (collectively "VEI"), appropriated Ace's designs and ideas for a new machine designed to manufacture novelty game tickets known as "jar tickets." The facts alleged to support this claim are summarized in this court's ruling of August 30, 1990.

VEI filed a counterclaim on March 11, 1991. The basic premise of the counterclaim is that it was Ace, in conjunction with TPI and Greenwood, that misappropriated the designs and ideas from VEI. The allegations stated in support of this claim are taken to be true for purposes of these motions.

In November 1988, VEI was approached by Greenwood who, acting on behalf of Ace, asked whether VEI could manufacture banded jar tickets. VEI allegedly determined that the desired tickets could not be made on a conventional folding machine and claims to have suggested developing both a new kind of crimped ticket and a crimping machine for making it. VEI allegedly set out over the next year and a half to make the new products, receiving encouragement and expressions of interest from Ace. As alleged in the counterclaim most of the alleged communications between Ace and VEI were made through Greenwood by telephone, letter or in person.

[*3] In one of the parties' early discussions, VEI allegedly gave Ace sample crimps and a sketch of the proposed machine. These were allegedly passed on to Greenwood who then indicated that Ace wanted VEI to design and produce the machine. VEI claims that it was in reliance on such statements that it contacted its supplier and began production. Rough price quotations are claimed to have been given to Ace in late summer 1989.

Also in the summer of 1989 VEI claims to have been approached by agents of TPI, who expressed their corporation's interest in jar tickets produced by VEI. VEI

PLAINTIFF'S
EXHIBIT

A

allegedly informed both Ace and TPI of the other's similar interests whereupon the corporate counterdefendants separately tried to convince VEI to enter into a special arrangement to the exclusion of all other competitors. The counterclaim states that such proposals were repeatedly presented to and rejected by VEI over the next year.

In September 1989, VEI requested $ 25,000 as a downpayment from both Ace and TPI. TPI allegedly signed an agreement with VEI and made the requested downpayment. Ace first attempted to obtain an exclusive arrangement with VEI and to assert proprietary rights over VEI's machine. VEI [*4] objected, and Ace allegedly signed an agreement that was silent on both terms.

The agreements signed by Ace and TPI do not appear to embody their entire relationship with VEI for discussions allegedly continued through the fall and winter 1989-90. In the course of these discussions, the corporate counterdefendants individually asked VEI to manufacture a gluing attachment for its new machine. In January 1990, however, having failed to reach an accord on exclusivity, VEI's negotiations with the counterdefendants purportedly broke down.

Meanwhile, Greenwood filed a patent application with the United States Patent and Trademark Office. According to VEI, Greenwood used VEI's trade secrets, designs, ideas and inventions. Also in the winter of 1990 Greenwood, as an agent for Ace, allegedly began negotiations with a competitor of VEI. The subject matter of these negotiations was the creation of machines with which to create jar tickets. The negotiations allegedly resulted in an exclusive arrangement and vendor agreement between Ace and the new supplier. According to the counterclaim, VEI was unaware of these developments at the time.

A short time thereafter, VEI allegedly sent Ace and TPI samples [*5] produced by its new machine "pursuant to VEI's agreements to manufacture the jar ticket machine for Ace and TPI." VEI believes that acting on Ace's behalf, Greenwood "revealed to the new supplier critical aspects of Vijuk's designs, ideas and inventions.' Then, VEI complains, instead of informing it of Ace's agreement with the new supplier, Greenwood encouraged VEI to continue its work for Ace.

In February and March 1990 VEI and TPI exchanged draft agreements. The parties still could not agree on the issue of exclusivity. Nevertheless, TPI did sign a confidentiality agreement whereby TPI allegedly undertook to maintain the confidentiality of information and materials disclosed by VEI.

Greenwood signed a similar agreement on behalf of Ace. However, Greenwood also added language excluding from the agreement information (1) in the public domain, (2) already in Ace's possession, or (3) later disclosed to Ace by a third party. VEI states that it never agreed to the additional language. Instead, VEI sent Ace a draft agreement which stated that all patent rights belong to Vijuk.

Apparently Ace never signed the proposed agreement and, VEI complains, did not disclose its agreement with the [*6] new supplier. Rather Ace again encouraged VEI to continue to work on the gluing attachment. VEI then sent a letter to both Ace and TPI indicating that the gluing attachment was Vijuk's invention and would attach directly to Vijuk's patented machine. VEI further requested that the corporate counterdefendants make an additional $ 27,000 deposit and sign a confidentiality agreement for the attachment. TPI allegedly complied with the request; Ace apparently did not.

In response to VEI's invitation to Ace, Greenwood and Benjamin Mayers, Chairman of the Board of Ace, visited VEI in Illinois in April 1990. VEI demonstrated its crimping machine and allegedly gave the men sample tickets. At that time, Greenwood revealed that he had filed a patent application for the new jar ticket, but allegedly conceded Vijuk had patent rights to the machine VEI was producing. Mayers offered to buy those rights, but Vijuk refused.

The counterclaim goes on to state that without telling VEI, Greenwood "took the samples produced by VEI's machine and gave them to his attorney for purposes of using the tickets against VEI in the United States Patent Office." Greenwood also allegedly submitted a declaration to [*7] the Patent Office claiming that VEI's tickets infringed on his patent application. According to VEI this declaration fails to disclose that Greenwood had received sample tickets prior to the date of his purported discovery of the machine or that Greenwood had encouraged VEI to work on the machine.

In early April 1990, Ace allegedly sent its new supplier an earnest money deposit for the purchase of a jar ticket machine similar to the one produced by VEI. At the same time Ace allegedly encouraged VEI to continue work on its machine. VEI claims to have received similar encouragement from TPI. However, on April 14, 1990, Ace and TPI allegedly signed a formal agreement to jointly seek a supplier for jar ticket machines, to waive claims to exclusivity in such machines, and to share technical and price information in order to reduce the price they would pay for the machines. In reaching this agreement Ace suggested TPI enter into an arrangement with Ace's new supplier.

Unaware of these events, VEI allegedly continued its good faith negotiations with the two corporate counterdefendants, and sent another round of draft agreements.

VEI also requested copies of Ace's patent documents regarding [*8] the design of jar tickets. The documents were never sent and Mayers allegedly informed VEI that to send the copies would violate Ace's contract with TPI. The next day, TPI reused to sign VEI's proposed agreement. Because of these exchanges, VEI alleges, Vijuk informed TPI that VEI would sell its machines on the open market. TPI passed the news on to Ace.

Allegedly in order to prevent the open sale of VEI's machines, Ace and TPI each agreed to send VEI a $ 3,000 deposit for three additional machines. Neither Ace nor TPI revealed that they had reached an agreement with the new supplier, however. Thus, VEI claims, having received the additional deposits and believing Ace and VEI to be acting in good faith, VEI sent more samples to each corporation, tried to finalize an agreement with them, and continued to work on its machines.

In May 1990, Ace and TPI allegedly approached VEI's supplier in an effort to get it to deal directly with them. The supplier refused. The corporations also met with their new supplier and, VEI believes, revealed VEI's secrets, ideas, inventions, and designs.

Finally, the counterclaimants aver that the filing of this lawsuit was no more than an attempt to prevent [*9] VEI from selling its machines on the open market. VEI states that this action was taken "even though Ace and TPI knew that they had long ago contracted to purchase machines to make a comparable product from the new supplier and manufacturer, and even though they knew they had violated the confidentiality agreements they had signed with VEI."

The defendants' legal claims are presented in seven counts. Count I charges Ace and Greenwood with fraud and inequitable conduct. Counts II-IV respectively seek relief for alleged violations of the Illinois Trade Secret Act, Illinois Deceptive Business Practices Act and Lanham Act, while Count V alleges breach of contract. Count VI requests the imposition of a constructive trust over the machine produced by the new supplier and allegedly owned by Ace and TPI. Finally, Count VII adds a claim for additional compensation based on a theory of civil conspiracy.

The counterdefendants have filed three motions aimed at dismissal of different parts of the counterclaim. Greenwood argues in one motion that he must be dismissed as a party because this court lacks jurisdiction over him. A second motion seeks dismissal of the counterclaim as a whole because [*10] it was untimely filed and therefore should never have been allowed under Rule 13(f) of the Federal Rules of Civil Procedure. The third motion attacks portions of the counterclaim under Federal Rule of Civil Procedure 12(b).

## CIVIL PROCEDURE

The briefing on a motion to dismiss generally consists of the motion and supporting memorandum, a response by the nonmovant, and reply by the movant. The purpose of the reply brief is to respond directly to matters raised in the response brief and not to introduce new factual or legal arguments. In this case, the reply memoranda submitted by the counterdefendants present factual claims and supporting authorities not mentioned in the earlier briefs. VEI is therefore entitled either to an opportunity to respond or to have the briefs stricken. The underlying motions to dismiss can be decided in this case on the basis of the counterclaim, the counterdefendants' original motions, and the counterclaimants' responses. Accordingly, we will strike the replies rather than impose on the defendants the cost of filing additional briefs.

## DISCUSSION

1. Personal Jurisdiction over Greenwood

A federal court sitting in diversity has personal jurisdiction over [*11] a nonconsenting nonresident defendant only if a court of the forum state could exercise personal jurisdiction over that defendant. Davis v. A & J Electronics, 792 F.2d 74, 75 (7th Cir. 1986); West Coast Video Enterprises, Inc. v. Ponce De Leon, No. 90 C 1236, Memorandum Opinion and Order (N.D.Ill. February 5, 1991). The party asserting personal jurisdiction bears the burden of proof and, in attempting to meet this burden, benefits from the presumed truth of the facts alleged in its pleading.

The Illinois Supreme Court has recently indicated that jurisdiction under the state long arm statute must satisfy three distinct standards. The nonresidents connection with Illinois (1) must be based on of the types of conduct enumerated in the statute, (2) must meet federal due process requirements and (3) must meet state due process requirements. Rollins v. Ellwood, 152 Ill.Dec. 384, 565 N.E.2d 1302 (Ill. 1991). Whether these standards are met may only be determined upon a case specific evaluation of the nature and extent of the nonresident's contacts with Illinois.

The parties agree that Greenwood once visited and has made numerous telephone [*12] calls to Illinois. VEI asserts that these contacts provide a solid basis for personal jurisdiction under the Illinois long-arm statute, Ill.Rev.Stat. ch. 110, § 2-209(1) and (2). Pursuant to those provisions, a nonresident may be haled into Illinois court on a cause of action arising from the transaction of business or commission of a tortious act in the state. Greenwood argues, however, that because his contacts with Illinois occurred while he was acting purely in his capacity as an agent of Ace, he is protected by the fiduciary shield doctrine.

The fiduciary shield doctrine is now a recognized limitation on the reach of the Illinois long-arm statute. Rollins, 565 N.E.2d at 396. The doctrine protects an individual from being haled into court in Illinois when the individual's only contacts with the state occurred in the course of work done on behalf of his corporation. Burhope v. National Mortgage Equity Corp., 153 Ill.Dec. 394, 567 N.E.2d 352 (Ill.App. 1 Dist. 1990). "This doctrine is based on the perceived unfairness of forcing 'an individual to defend a suit brought against him personally in a forum with which his only relevant [*13] contacts are acts performed not for his own benefit but for the benefit of his employer.'" West Coast Video, Memorandum Opinion and Order, quoting Washburn v. Becker, 186 Ill.App.3d 441, 542 N.E.2d 764, 766 (1 Dist. 1989).

VEI makes two arguments for the doctrine's inapplicability in this case. First, VEI argues that when Greenwood telephoned and came to Illinois he was acting for his own benefit. In support of this argument, VEI points to the allegations that Greenwood (1) filed a patent application, (2) "took" from Illinois samples of tickets made by VEI and passed them on to his attorney, and (3) signed a United States Patent Office declaration impugning VEI. The first and third of these acts did not take place in Illinois and therefore may not serve as a basis for jurisdiction. They also do not serve in this case to convert conduct taken on behalf of Ace into actions for Greenwood's personal benefit. As to the so-called taking of VEI's samples, other portions of the counterclaim indicate that Greenwood were in Illinois upon VEI's invitation to Ace, and that the samples were given to him while he was acting in that capacity. Finally, even if [*14] Greenwood were acting for his personal benefit in giving the samples to his attorney, such conduct also took place outside of Illinois and therefore does not provide a basis for this court's exercise of jurisdiction over Greenwood. [1]

> 1 Had they been properly presented, the documents attached to Greenwood's reply brief would have reinforced this conclusion. One document indicates that Greenwood transferred his patent rights to Mayers in February 1990. Thus, Greenwood allegedly did not own the patent when he visited Illinois and signed the declaration. A second document indicates that Mayers later assigned the patent rights to Ace. If true, these facts seem to negate the reference that Greenwood's alleged acts were taken for Greenwood's personal benefit.

Second, VEI argues that because Greenwood was involved in a fraudulent scheme, he is not entitled to the benefits of the doctrine. This argument was expressly rejected by the Illinois Supreme Court in Rollins. In that case a Maryland police officer was sued for his [*15] participation in the allegedly tortious restraint and transportation of the plaintiff. The officer had come to the state and engaged in conduct giving rise to the plaintiff's cause of action solely in his capacity as an agent of his employers. While noting that such contact might constitute sufficient contacts under federal due process standards, the Illinois Supreme Court held that state due process standards are more restrictive.

We find it to be unfair and unreasonable, under Illinois' due process clause and the tenets of our concept of the jurisdictional power of the Illinois courts, to assert personal jurisdiction over an individual who seeks the protection and benefits of Illinois law, not to serve his personal interests, but to serve those of his employer or principal. We decline to define our courts' jurisdictional power so broadly as to compel a nonresident such as Ellwood to defend himself in the courts of this State.

Id. at 1318. In reaching this conclusion, the state supreme court expressly declined "to fashion an exception to the fiduciary shield doctrine that will expose employees who engage in tortious conduct within the scope of their employment to the personal [*16] jurisdiction of Illinois courts." Id.

As alleged in VEI's counterclaim Greenwood's contacts with Illinois consist of telephone calls, letters and one visit to Illinois all of which were made on behalf of Ace. In short, Greenwood's only connection with this state arose from acts performed for the benefit of his employer. Thus, in light of Rollins, we find that it would not be would be fair, just and reasonable to subject Greenwood to the jurisdiction of this court, and VEI's claims with respect to Greenwood are dismissed for want of personal jurisdiction.

2. Untimeliness of Counterclaim

A belated counterclaim may be added to the pleadings with leave of court "when a pleader fails to set up a counterclaim through oversight, inadvertence, or excusable neglect, or when justice requires." Fed. R. Civ. P. 13(f). Although the party seeking to add or maintain the counterclaim must show that one of the grounds for amendment applies, in light of this district's preference for resolution of disputes on the merits, the requirements of Rule 13(f) are liberally construed. SFM Corp. v. Sundstrand Corp., 99 F.R.D. 101, 104 (N.D.Ill. 1983); In re Financial Partners Class Action Litigation, 597 F.Supp. 686, 688 (N.D.Ill. 1984). [*17] Under such construction, unexcused untimeliness alone is rarely sufficient reason to dismiss a counterclaim. Instead, courts look to see whether there has been "undue delay, bad faith or dilatory motive, . . . repeated failure to cure deficiencies by amendments previously allowed, undue

prejudice to the opposing party by virtue of the allowance of the amendment, etc." Laborers' Pension Fund v. Litgen Concrete Cutting & Coring Co., 128 F.R.D. 96, 99 (N.D.Ill. 1989), quoting Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962).

VEI's counterclaim was filed in March of this year, six months after the defendants' amended answer was filed. Citing Rule 13(f), the counterdefendants argue that because VEI had the information it needed to present the counterclaim when it filed its amended answer, the delay of six months in filing the counterclaim was undue. We do not agree.

Since potentially relevant discovery was scheduled to continue past the filing of VEI's amended answer in mid-September 1990, we are unwilling to hold that VEI's failure to file the counterclaim with its amended complaint was unjustified. [*18] The truly questionable delay in this case appears to have been from mid-September 1990 to mid-March 1991. It is not clear what transpired with respect to this litigation in October 1990. However, in November of that year VEI changed attorneys, and its former counsel refused to pass on the files to the new counsel. As a result, VEI's current counsel did not obtain the papers until January 15, 1991. From mid-January to mid-March 1991 when the counterclaim was filed, VEI's present counsel were occupied with reviewing the apparently voluminous pleadings and discovery material already amassed in this case. In light of these events, we cannot categorically say that the counterclaim was unexcusably tardy.

The Foman concepts of "undue delay" and "undue prejudice" require a balancing of the prejudice to both sides resulting from the maintenance or dismissal of the counterclaim. See SFM Corp, 99 F.R.D. at 107. Here, much of the claims asserted in VEI's counterclaim and in Ace's complaint are so interrelated that the discovery taken with respect to one will likely be all that is needed for the other. However, VEI does introduce new parties and theories which may require [*19] additional discovery from already tapped sources. Such supplemental discovery is to some extent prejudicial to the counterdefendants.

On the other side of the scale is the fact that VEI's counterclaim is "compulsory" under Rule 13(a). As a result, barring the counterclaim now would preclude VEI from asserting its claims in a subsequent federal forum or, pursuant to principles of res judicata, possibly in a state forum. Such preclusion would be highly prejudicial to VEI. Thus, in balancing the prejudice in this case, it seems that the scales slant in favor of the counterclaimants. Accordingly even if the late filing of the counterclaim were unjustified we would deny the counterdefendants' Rule 13(f) motion.

### 4. Venue

According to the counterdefendants each count in the complaint, and Count V in particular, implicate the agreements between VEI and Ace and VEI and TPI. These confidentiality agreements contain forum selection clauses designating the Circuit Court of Cook County as the proper forum. Based on these clauses, the counterdefendants argue that the counterclaim should be dismissed for improper venue.

We will not enforce the forum selection clauses in this case for the same reasons [*20] that we will not dismiss the counterclaim under Rule 13(f). The claims asserted by Ace and VEI in this case are so intertwined that the resolution of one party's claims will necessarily impact on the resolution of the other's. Under such circumstances, dividing the parties' claims among different forums could result in either the preclusion of one party's claims or conflicting judgments. At the very least, forcing VEI to bring its claims in state court while simultaneously adjudicating Ace's claims in this court would be wasteful of judicial as well as the litigants' resources. Thus, it is clear that enforcement of the forum selection clauses would be unreasonable and possibly unjust. See M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 15, 92 S. Ct. 1907, 32 L.Ed.2d 513 (1972) (forum selection clauses are presumptively valid unless the party opposing the clause can clearly show that enforcement of the clause would be unreasonable or unjust.) We therefore will not dismiss the counterclaim on the basis of improper venue.

### 5. Sufficiency of the Allegations

On a motion to dismiss, the allegations of the subject pleadings are assumed to be true [*21] and all reasonable inferences drawn from the pleading are viewed in the light most favorable to the nonmovant. H. J. Inc. v. Northwestern Bell Telephone 492 U.S. 229, 109 S.Ct. 2893, 2906 106 L.Ed.2d 195 (1989). The court need not, however, accept the legal conclusions stated in the pleading. The issue on such motions is whether the nonmovant has alleged sufficient facts to state a claim upon which relief can be granted in the presiding forum. Only when it appears beyond doubt that the nonmovant can prove no set of facts in support of his claim which would entitle it to it to such relief may the motion be granted. Conley v. Gibson, 355 U.S. 41, 46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

To withstand a motion to dismiss a pleading generally need only set forth short and plain statements of the grounds for federal jurisdiction, the claim entitling the plaintiff to relief, and the demand for relief. Fed. R. Civ. P. 8(a). Where fraud, constructive trust, or conspiracy are alleged, however, greater specificity is generally required. See Fed. R. Civ. P. 9(b)(fraud); Suttles v. Vogel,

127 Ill.Dec. 819, 533 N.E.2d 901, 905, 126 Ill.2d 186 (Ill. 1988); [*22] Morgan v. GTECH, No. 90 C.238, Memorandum Opinion at 5-6 (N.D.Ill. Dec. 18, 1990)(conspiracy).

A. Fraud

The Counterdefendants argue that VEI's fraud claims were waived when it failed to plead them as an affirmative defense as required by Federal Rule of Civil Procedure 8(c). The last sentence of Rule 8(c) states, however, that "when a party has mistakenly designated a defense as a counterclaim or a counterclaim as a defense, the court on terms, if justice so requires, shall treat the pleading as if there had been a proper designation." Fed. R. Civ. P. 8(c). Pursuant to this last sentence, if a defense is improperly designated as a counterclaim, the court may relabel it as a defense. Wright & Miller, Federal Practice and Procedure, vol. 5, § 1275 at 458. Accordingly, we will not dismiss Count I simply on the grounds that it was improperly plead as a counterclaim. See also Dixie-Portland Flour Mills v. Nation Enterprises, 613 F.Supp. 985, 990 (N.D.Ill. 1985) where the court addressed the sufficiency of fraud claims which had been presented in the form of a counterclaim.

Under Illinois law, a cause of action for fraud consists of six elements: (1) a false statement [*23] of material fact; (2) known or believed to be false by the party making it; (3) an intent to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; (5) justifiable reliance or the right to rely; and (6) damage to the other party resulting from such reliance. Dixie-Portland Flour Mills, 613 F.Supp. at 990. A false statement for purposes of this test may be an affirmative statement or a material omission when the omission is misleading.

Count I must be dismissed for failure to allege a false statement on which VEI actually relied or had a right to rely. VEI asserts that the counterdefendants' failure to reveal their relationship with a third party supplier constituted a material omission made with an intent to induce VEI to continue to produce its machinery and send samples of its new jar tickets to Ace and TPI. Allegedly in reliance on the false representations, VEI claims that it not only proceeded with the development and modification of its machines, but also abstained from putting its $ 90,000 machines on the open market. However, nothing in VEI's pleading indicates that it had a right to expect the counterdefendants [*24] either to refrain from negotiating or contracting with another supplier or to inform VEI that such negotiating or contracting has taken place. In fact it was allegedly at VEI's insistence that the parties had no exclusive arrangement. Under these circumstances, it appears that VEI had no right to expect Ace or TPI to deal exclusively with it, and

any reliance on such expectation is therefore unjustified. VEI has cited no authority to persuade us otherwise.

VEI also claims that the counterdefendants' only sent the extra $ 3000 deposits in order to obtain VEI's proprietary information and to prevent VEI from selling its machine on the open market, and made false representations to third parties. Neither of these aequately support a claim for fraud. Even if the deposits could somehow be considered false statements, this allegation is more properly considered in connection with the alleged violations of the Illinois Trade Secret Act addressed in Count II of the counterclaim. See Ace v. Vijuk Equipment, Inc., No. 90 C 3116, Memorandum Opinion at 8 (N.D.Ill. August 30, 1990) (Illinois Trade Secret Act provides the exclusive remedies for misappropriation of ideas). As to the false statements [*25] allegedly directed at third parties, the complaint does not allege that the statements were intended to induce VEI to act or that VEI actually relied on them. Accordingly, those statements may not serve as a predicate for VEI's fraud claim.

Because VEI has failed to allege all of the necessary elements of fraud, Count I is dismissed for failure to state a claim upon which relief may be granted.

B. Constructive Trust

An action for constructive trust is not one for recovery or compensation under any theory of tort of contract law. People ex. rel. Daley v. Warren Motors, Inc., 91 Ill.Dec. 145, 483 N.E.2d 427, 431 (Ill. App. 1 Dist. 1985), aff'd 102 Ill. Dec. 400, 500 N.E.2d 22, 114 Ill.2d 305 (1986). Rather, it is a restitutionary remedy aimed at the return of property to the party to whom the property justly belongs from one who has obtained the property by some form of wrongdoing. Id.; A. T. Kearney, Inc. v. Inca Intern., Inc., 87 Ill. Dec. 798, 479 N.E.2d 1326, 1332 (Ill.App. 1 Dist. 1985). Generally the wrongdoing requirement is met by allegations of fraud or an abuse of [*26] a confidential or fiduciary relationship. Such a relationship "exists where there is a special confidence reposed on one side and a resulting superior knowledge and influence on the other." A.T. Kearney, 479 N.E.2d at 1332.

As neither fiduciary relationship or fraud have been properly alleged in this case, the counterdefendants argue that Count VI must be dismissed. However, Illinois courts have often held that the propriety of imposing a constructive trust is not limited to instances in which fraud or a fiduciary relationship is alleged. Warren Motors, Inc., 483 N.E.2d 427, 430. The counterclaim in this case alleges that the counterdefendants have violated the Illinois Trade Secrets Illinois Deceptive Business and Lanham Acts. The sufficiency of these allegations are not challenged on this motion and seem to satisfy the

wrongdoing requirement for a constructive trust action. Thus the fact that VEI failed to properly allege fraud or the existence of a fiduciary duty is not fatal to Count VI.

The count must nevertheless be dismissed for failing to identify an existing res that justly belongs to VEI. The first part of Count [*27] I lays claim to the machine manufactured by the new supplier. But the grounds for VEI's claim to beneficial ownership of that machine are not stated. What should belong to VEI, assuming the truth of its allegations, are those ideas appropriated from VEI that went into the creation of the machine allegedly owned by the counterdefendants, not the machine itself. Viewed in this light, VEI simply alleges the misappropriation of its ideas, see Counterclaim para. 101 at 25("Ace and TPI have wrongfully acquired legal title to machinery based upon Vijuk's proprietary inventions through fraud and misappropriation."), and VEI's only recourse for such misconduct is provided by the Illinois Trade Secrets Act.

In the alternative VEI claims "all sums received by Ace or TPI, or both from their use or sale of the machinery based upon Vijuk's propriety inventions." Counterclaim para. 102 at 25. However, VEI has not alleges any facts to suggest that Ace or TPI have used, sold or profited from the machine allegedly created by the new supplier, or that such benefits robbed VEI of an advantage to which it was entitled. Thus, such statements lack the specificity required to state a cause of action [*28] for the imposition of a constructive trust. See Suttles v. Vogel, 127 Ill.Dec. 819, 533 N.E.2d 901, 905 (Ill. 1988)(the grounds for imposing a constructive trust must be so clear, convincing, strong and unequivocal as to lead to but one conclusion.)

C. Conspiracy

A civil conspiracy is

"a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreements between the parties 'to inflict a wrong against or injury upon another' and 'an overt act that results in damage.'"

Plambeck v. Stone, 662 F.Supp. 298, 301 (N.D.Ill. 1986), quoting Hampton v. Hanrahan, 600 F.2d 600,

620-1 (7th Cir. 1979), rev'd in part on other grounds, 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980), quoting Rotermund v. United States Steel Corp., 474 F.2d 1139, 1145 (8th Cir. 1973). To successful state a claim for relief for a civil conspiracy, the claimant "must identify the nature of the conspiracy and the defendant's role in it with some particularity." [*29] Morgan v. GTECH Corp., No. 90 C 238, Memorandum Opinion at 5 (N.D.Ill. December 18, 1990), citing Frymire v. Peat, Marwick, Mitchell & Co., 657 F.Supp. 889, 895-6 (N.D.Ill. 1987). In addition, the claimant must state "with some particularity facts sufficient to show that there exists between the alleged conspirators an agreement to inflict the alleged wrong." Id.

In this case, the counterclaimants state that Ace and TPI conspired to misappropriate the inventions of VEI, to defraud VEI, and to misrepresent the true ownership of the designs for machinery and jar tickets. In support of this statement, VEI alleges that Ace and TPI agreed (1) to seek a third party supplier for a jar ticket machine, (2) to not pursue an exclusive arrangement with that supplier, and (3) to share price information with one another. What VEI has not alleged is that Ace and TPI entered into this agreement specifically to inflict the alleged wrong against counterclaimants or that the counterdefendants' benefited from their alleged conduct. The counterclaim does allege that Ace and TPI later revealed VEI's ideas, inventions, designs, and trade secrets to the new supplier, but there [*30] are no allegations connecting such revelations to the purported conspiracy. oAt most VEI's allegations suggest that Ace and TPI reached an agreement in furtherance of their business objectives, and in the process of attaining those objectives, they inflicted harm on VEI. Such allegations are insufficient to state a claim for conspiracy under Illinois law.

## CONCLUSION

Based on the foregoing, the counterclaimants' motion to strike is granted, as is Greenwood's motion to dismiss for lack of subject-matter jurisdiction. In addition, we dismiss Counts I, VI, and VII for failure to state a claim upon which relief can be granted. The counterdefendants' motion to dismiss pursuant to Rule 13(f) and objections to the counterclaim based on timeliness and venue are, however, denied.

LEXSEE 1989 U.S. DIST. LEXIS 10573

**LENORE F. FASULES, individually and as Executor of the Estate of JAMES E. FASULES, and NANCY FASULES, Plaintiff, v. D.D.B. NEEDHAM, WORLDWIDE, INC., a New York Corporation, and OMNICOM GROUP, INC., a New York corporation, Defendants**

**No. 89 C 1078**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

**1989 U.S. Dist. LEXIS 10573**

**September 7, 1989, Decided**

**OPINION BY:** [*1] KOCORAS

**OPINION**

*MEMORANDUM OPINION*

*CHARLES P. KOCORAS, UNITED STATES DISTRICT JUDGE*

*This matter is before the court on a motion for summary judgment filed by Defendants D.D.B. Needham Worldwide, Inc. ("Needham") and Omnicom Group, Inc. ("Omnicom") For the following reasons, defendants' motion is denied.*

*FACTS*

*This litigation grew out of an ill-fated fishing and white water rafting trip on the Chilko River sponsored by the defendants, at least in part, for purposes of attracting new business. The Chilko River is located in British Columbia, Canada and contains a series of whitewater rapids collectively known as the "White Mile." It is on the rapids of the White Mile that the relevant events transpired.*

*On August 1, 1987, all of the trip's ten participants, including plaintiffs' decedent, James E. Fasules, along with a guide, attempted to negotiate the White Mile in a whitewater raft. They did not succeed, however. The raft capsized in the last section of rapids when it hit a large rock, throwing all but one of the occupants into the water. Fasules along with four others drowned when they could not extricate themselves from the swiftly moving water.*

*In response to Fasules' death, the [*2] plaintiffs, his immediate family, filed suit against the defendants. The complaint is comprised of wrongful death and survival actions which sound in both negligence and strict liability. The essence of the various counts is that the defendants, acting through their employee, Al Wolfe, breached a duty owed to Fasules, when he failed to warn Fasules of the nature of the risks involved in rafting the White Mile.*

*After the defendants' initial attempt to get the case dismissed on forum non conveniens grounds was denied by this court, it filed the present motion for summary judgment. The defendants argue that they are entitled to summary judgment for two reasons: (1) James Fasules was owed no duty of care because the risks of white water rafting should have been obvious to him; and, (2) in any event, the defendants had been relieved of any liability arising out of the 1987 trip by an express release executed by Fasules.*

*DISCUSSION*

*I. Preliminary Issues*

*Before the merits of the defendants' motion can be reached, two preliminary issues must be addressed. First, the plaintiffs have moved to strike allegedly new grounds for summary judgment raised by the defendants for the first time in [*3] their reply brief. Second, plaintiffs argue that the defendants' summary judgment motion must be denied antecedent to the merits because the motion failed to comply with a procedural rule of this district.*

*A. Motion to Strike Portions of Defendants' Reply Brief*

*Defendants' Reply Brief apparently alludes to other potential grounds for summary judgment which were not even mentioned in their initial memorandum in support of the motion. Specifically, the defendants complain: (1) that "[n]o relationship existed between plaintiff and these defendants which could given rise to a duty of care"; (2) that the "[d]efendants through Al Wolfe were not negligent"; (3) that "Ron Thompson, the guide was not defendant's agent"; and (4) that "Ron Thompson was not negligent." See* Defendant's Reply Brief at 2. The plaintiffs have moved to strike the references to these potentially new arguments, arguing that any grounds for summary judgment not raised in the initial memorandum in support of the motion were waived. Interestingly, in their response to the plaintiffs' motion to strike, the defendants state that they did not intend to "broaden the scope" of their original motion when they submitted [*4] their reply brief.

Given the parties' agreement that the defendant has articulated only the original two grounds in support of its motion, this court will not disagree. But even without the defendants' agreement, any new issues would have to be disallowed at this point because the plaintiffs have not had an opportunity to respond. *See e.g. Autovox v. Lenco Italiana,* 208 U.S.P.Q. (BNA) 412, 415 (N.D. Ill. 1980) (stating that because plaintiff "did not have an opportunity to file a sur-reply addressing the new matters raised in defendant's reply brief, . . . the court will not address the merits of the argument"). Accordingly, only the obviousness of the risk and the signed release will be considered in deciding whether to grant the defendants' motion. To the extent the defendants have argued law or facts not relevant to these two grounds, they will be ignored. [1]

> 1   Defendants should also note that even if they had properly raised the most potent of the "additional" grounds -- the lack of a relationship between Fasules and the defendants which would give rise to a duty of care -- the motion would still have to be denied because, even without giving the plaintiff an opportunity to file a sur-reply, there are genuine issues as to facts material to the nature of the relationship. Defendants cite to the depositions of Al Wolfe and John Collins for the purpose of showing that Fasules' presence on the trip was unrelated to business. Defendants' Reply Brief at 8-10. As plaintiffs note in their opposition brief, however, Al Wolfe also stated in his deposition that Fasules had been an important officer in Needham before his retirement and had since done consulting work for Needham on at least one occasion. Plaintiffs' Opposition Brief at 2. More important, plaintiffs cite to a letter from Omnicom's counsel to Omnicom's insurance car-

rier which clearly describes the purpose of the trip as business solicitation. See Exh. B of Plaintiffs' Opposition Brief at 2-3. Although this letter pre-dates Fasules' invitation to attend, given Fasules' prior high-ranking position with Needham, this evidence can lead to a reasonable inference that Fasules was invited as more than just an old friend of Al Wolfe. Because of this clash of evidence, judgment as a matter of law would not be appropriate.

[*5]  B. *Local Rule 12(e)*

The second preliminary issue concerns the fact that in moving for summary judgment, the defendant failed to file a statement of material facts over which there is no genuine issue, as is required by Rule 12(e) of the General Rules of the United States District Court for the Northern District of Illinois. The plaintiffs argue that the defendants' failure to comply with Rule 12(e) warrants denial of their motion. The defendants first counter this argument by asserting that no such statement of facts is necessary where only points of law are being argued. In the alternative, defendants request leave to file a statement in compliance with Rule 12(e).

At the outset, it should be noted that failure to comply with Rule 12(e) is a sufficient ground for denying a motion for summary judgment. The rule itself provides that the "[f]ailure to submit such a statement constitutes grounds for denial of the motion." Moreover, at least one court in this district has denied a summary judgment motion solely because the movant failed to comply with Rule 12(e). *See Powers v. Dole,* 607 F. Supp. 841, 843 (N.D. Ill. 1984) (denying plaintiff's motion for summary judgment)

Defendants's [*6] initial argument to the effect that it need not comply with Rule 12(e) because only points of law were argued, must fail. Regardless of what the law is with respect to a given issue, it is always necessary to apply facts to the law in order to reach a conclusion. Thus, the statement of uncontested facts remains crucial. What the defendants may mean is that even if the facts as alleged by the plaintiff are taken as true, the law still provides no remedy (i.e., that the defendants are using the summary judgment motion as a substitute for a Rule 12(b)(6) motion to dismiss the complaint as failing to state a claim upon which relief can be granted). But even if this were the case, the defendants would still need to state the fact that it accepted all of the plaintiffs' allegations as true for purposes of its motion, in order to comply with Local Rule 12(e). Moreover, the fact that the defendants' reply brief is riddled with factual assertions and references to deposition transcripts belies their assertion that only principles of law were at issue. Plaintiffs, therefore, are correct in asserting that the defen-

dants failed to comply with Rule 12(e). The question then remains whether defendants [*7] should be granted leave to provide a statement in compliance with the rule at this late date.

This issue, however, need not be reached. Although leave to comply should not be granted in this case because of the defendants' severe procrastination in requesting it, [2] denial of the defendants' motion need not be grounded solely in a failure to comply with a local procedural rule. For even if this court were to grant the defendants leave to file a complying statement of facts, their motion would still have to be denied on the merits.

> 2    Defendants did not request leave to file a complying statement of facts in their reply brief, which would have been the most appropriate time to do so. Instead, the defendants waited until their response to the plaintiffs' motion to strike portions of the reply brief to request leave. By this point, the defendants had already received more than ample time to respond to all of the plaintiffs' arguments in opposition to the motion, including the failure to comply with Rule 12(e).

II. The Merits of Defendants' Motion for Summary Judgment

Summary judgment is appropriate if the pleadings, answers to interrogatories, admissions, affidavits and other materials [*8] show "that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A material fact is one which might affect the outcome of the suit under applicable law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). No genuine issue exists "unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." Id. at 249. Summary judgment may be granted if the evidence is merely colorable or is not significantly probative. Id. at 249-50.

When a properly supported motion for summary judgment has been made, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." Id. The opposing party is entitled to the benefit of all favorable inferences which can reasonably be drawn from the underlying facts; however, only *reasonable* inferences will be drawn, not every conceivable inference. *DeValk Lincoln Mercury, Inc. v. Ford Motor Co.,* 811 F.2d 326, 329 (7th Cir. 1987).

Defendants articulate two grounds which they believe entitle them to summary judgment. First, the defendants argue that summary judgment is appropriate because [*9] the plaintiffs' decedent was owed no duty of care as a matter of law. Second, the defendants argue that

even if Mr. Fasules was owed such a duty, he released the defendants from any liability arising out of the trip. Neither of these grounds, however, is sufficient to grant the defendants' motion.

But before analyzing these two grounds, this court must first note that Illinois law, as forum law, will apply to this motion. Although both plaintiffs and defendants make much of a potential application of British Columbia law, there is no choice of law issue in this case. For choice of law to be an issue, one of the parties must raise a possible conflict between the forum's law and the foreign entity's law. *See, e.g., Gonzalez v. Volvo of Am. Corp.,* 752 F.2d 295, 299 (7th Cir. 1985) ("Where parties fail to raise a possible conflict of law, the better rule . . . is that the substantive law of the forum controls."). Since the plaintiffs and the defendants explicitly agree that the pertinent legal rules in Illinois and British Columbia are in complete agreement, Illinois law applies.

A. *The Obviousness of the Risk as Negating Defendants' Duty of Case*

*Defendants first argue that [*10] plaintiffs' decedent was owed no duty of care as a matter of law because the risks of whitewater rafting were so obvious that any reasonable person in Mr. Fasules' position would have realized them. Plaintiffs counter that while certain general dangers of whitewater rafting are obvious, others are not, and it is the latter which are relevant to this case.*

*Defendants are correct in asserting that Illinois law imposes no duty to warn where the risk at issue was so obvious that the plaintiff should have comprehended it on his own. See, e.g. Cope v. Doe,* 102 Ill.2d 278, 286, 464 N.E.2d 1023, (1984). This exception to the existence of a legal duty, moreover, is equally applicable whether the duty arises because of the defendant's status as a landowner as in *Cope,* or because of a special relationship between the plaintiff and the defendant, as is alleged in this case. Defendants are also correct when they state that many of the most obvious dangers involve dangerous activities and natural conditions of land or water.

Nonetheless, this cannot be the end of the inquiry; whether a reasonable person in Fasules' position would have realized the risk he was subjecting himself [*11] to depends upon the facts of the case. Applying the obvious-risk exception to this case, it is evident that the plaintiffs have raised sufficient evidence to reasonably infer that the dangers were not, and should not have been, obvious to a man in Fasules' position. Plaintiffs first point out the distinctions between the different classes of rapids and the differences in the risks posed by those classes. Plaintiffs' affiant, Les Bechdel, for example,

states that the White Mile offers Class IV & V rapids, which are particularly dangerous, and whose dangers would not be obvious to someone unfamiliar with whitewater rafting. Although defendants refer this court to various cases where risks have been found obvious as a matter of law, all of these cases turned on the specific plaintiff's ability to perceive the risk. Fasules' wife, Lenore, in this regard, states that her husband was unfamiliar with the intricacies of whitewater rafting and was never told of the nature of the White Mile's rapids or even that rafting was involved on the trip by the trip's sponsors. Although the defendants point in their reply brief to contrary evidence, this only creates a genuine issue as to what exactly [*12] Fasules knew about the White Mile before he agreed to participate in the August 1 rafting excursion that resulted in his death.

In short, this court cannot hold as a matter of law that the extraordinary risks posed by the White Mile would have been so obvious as to be evident to anyone, or that Mr. Fasules was actually informed of the dangers of the White Mile rapids before he agreed to go. Summary judgment, therefore, is not appropriate on this issue.

## B. *Fasules' Release*

*With respect to the second ground, the defendants take the position that regardless of whether the tort law provides the plaintiffs with a remedy on these facts, the defendants are nonetheless absolved from any such liability because Mr. Fasules, on the day the trip was to begin, signed a document releasing the defendants from any liabilities "arising out of personal injury or property damage or other damage arising out of [Fasules'] participation in the trip to Chilko Lake and the Chilko." De*fendants argue that this language explicitly precludes the present action by its reference to "any" liability arising out of the trip. Plaintiffs, on the other hand, argue that this language is too vague to exculpate [*13] the defendants from liability caused by their own negligence. Alternatively, plaintiffs argue that even if the release was sufficient to cover the defendants' own negligence, it is still not enforceable because (1) Fasules did not appreciate the risks he was about to be subjected to and (2) the signing of the release was not a product of Fasules' free will.

Like the first issue, however, this issue also cannot be resolved by summary judgment. First, the defendants' claim that the explicit language of the agreement at bar is so clear that no interpretation but its own would be reasonable, does not withstand scrutiny. While Illinois does recognize the validity of exculpatory agreements, they "are always to be strictly construed against the party in whose favor they operate." *Jackson v. First Nat'l Bank,* 415 Ill. 453, 463, 114 N.E.2d 721, 726 (1953). Under the

standards set forth by the Illinois courts, the broader the language used in the agreement, the less likely it is that it was meant to cover a specific risk. *See e.g., Calarco v. YMCA of Greater Metro. Chicago,* 149 Ill. App.3d 1037, 501 N.E.2d 268, 269-72 (2d Dist. 1986) (denying defendant's motion for summary judgment [*14] based on signed release, where plaintiff was injured by defendant's weight machines and exculpatory claused released defendant from claims "arising out of or connected with any participation in any activities of the [defendant]") Further, even where risks of a particular activity have been adequately revealed in a release agreement, courts are hesitant without explicit language to interpret a release to cover risks which are enhanced because of the defendant's own negligence, as has been alleged in this case. *See, e.g., Diedrich v. Wright,* 550 F. Supp. 805, 808 (N.D. Ill. 1982) (denying defendant's motion for summary judgment based upon release agreement in a negligence claim arising from injuries plaintiff received while parachute jumping, and stating that the only reasonable interpretation" of the general exculpatory language contained in the agreement was that "it exempts defendants from injuries that ordinarily occur, without any fault of the defendant, in such a hazardous sport"). [3] Nowhere in the agreement at issue in this case is there mention of whitewater rafting, the risks of whitewater rafting, negligence in general, or the negligence of the defendants. Given these [*15] serious ambiguities, this court cannot, as a matter of law, hold that this agreement covers the liabilities alleged in this case.

3    The defendants' reliance on *Randle v. Hinckley Parachute Center, Inc.,* 141 Ill. App.3d 660, 490 N.E.2d 1041 (2d Dist. 1986), another parachute jumping case where the defendant's motion for summary judgment was granted, is somewhat disingenuous. Nowhere in the opinion does the court quote or summarize the exculpatory language at issue. Thus, while the court stated that the clause at issue would have covered just such an injury as the plaintiff received, there is no way to compare the wording there with the wording in this case. More important, the issue for which defendants cite the case was not actually decided by the court. To quote the *Randle* court:

The plaintiff appears in his brief to raise a second argument, that his injury was outside the scope of injuries contemplated by the parties in the exculpatory agreement. This foreseeability argument was not raised before the trial court in plaintiff's Memorandum in Opposition to Motion for Summary Judgment, or elsewhere, and therefore *we do not consider* it.

490 N.E.2d at 1043 (citations omitted, emphasis added).

[*16]  Second, defendants ignore the fact that, under Illinois law, a person seeking to enforce an exculpatory clause must prove that at the time of the execution of the release, the person signing the agreement had specific knowledge of the risks he was about to be subjected to. *E.g., Russo v. Range, Inc.,* 76 Ill. App.3d 236, 395 N.E.2d 10, 13 (1st Dist. 1979). This test is a subjective one "geared toward the particular plaintiff and [his] situation, and the determination ordinarily will be made by a jury." *Larsen v. Vic Tanney Int'l,* 130 Ill. App.3d 574, 474 N.E.2d 729, 731 (5th Dist. 1984). As was stated earlier with respect to the obviousness of the risks presented by the White Mile, there are evidentiary discrepancies as to what Mr. Fasules knew and when he knew it. It is not a matter for this court to resolve these discrepancies on a motion for summary judgment.

For all of the foregoing reasons, the defendants' motion for summary judgment is denied.

Dated: September 7, 1989

1 of 1 DOCUMENT

**YOLANDA H. CARNES, Plaintiff, v. MCI TELECOMMUNICATIONS CORP., Defendant.**

**Case No. 96 C 0627**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

**1997 U.S. Dist. LEXIS 19574**

**December 3, 1997, Decided**
**December 3, 1997, Filed; December 4, 1997, Docketed**

**DISPOSITION:**     [*1]  Plaintiff's motion to strike granted in part and denied in part. Defendant's motion for summary judgment granted as to all claims. Judgment entered in favor of defendant.

**COUNSEL:** For YOLANDA H CARNES, plaintiff: Richard J. Gonzalez, Chicago-Kent College of Law, Illinois Institute of Technology, Chicago, IL.

Yolanda H Carnes, plaintiff, Pro se, Aurora, IL.

For MCI TELECOMMUNICATIONS, defendant: John Peirce Morrison, Melissa Anne Siebert, Bell, Boyd & Lloyd, Chicago, IL.

For MCI TELECOMMUNICATIONS, defendant: Susan E. Dunnings, Misti Mukherjee, MCI Office of The General Counsel, Washington, DC.

**JUDGES:** Harry D. Leinenweber, Judge, United States District Court.

**OPINION BY:** Harry D. Leinenweber

**OPINION**

**MEMORANDUM OPINION AND ORDER**

Plaintiff Yolanda Carnes ("Carnes") sues defendant MCI Telecommunications Corporation ("MCI") for discrimination, harassment, and retaliation based on race and sex (pregnancy) discrimination in alleged violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000(e) *et seq.* and 42 U.S.C. § 1981. Defendant now moves for summary judgment on all claims.

**BACKGROUND**

The court gleans the following facts from the parties 12(M) and 12(N) statements [*2]  of undisputed fact. Plaintiff, an African-American female, began working in MCI's Chicago office in April, 1994 as a Customer Service Professional ("CSP"). While in that position, Carnes was supervised by a variety of people, including Kitty Dekuyper ("Dekuyper"). Dekuyper, who is Caucasian, reported to Caroline Gloodt ("Gloodt"), who is also Caucasian. Carnes performed well in her first six months and received a promotion in October, 1994. Then, in late 1994, Carnes applied for, and was offered, the position of Initial Trainer in MCI's newly opened customer support center in Houston/Sugarland, Texas. She began working there in January, 1995.

However, plaintiff became pregnant and, since her husband still lived in Chicago, plaintiff decided to return to Chicago. Her manager in Texas, David Gerstmeier, told plaintiff that she would have to make a presentation to the hiring manager in Chicago in order to secure a post as an Initial Trainer in Chicago. MCI has a policy whereby it posts available jobs with their corresponding job requirements and employees who have been in his or her current position for six months or more may apply for the vacant position. Employees could not transfer [*3]  to the same position in a different location without going through formal procedures, although, on occasion, an office in need could request that another office "loan" an employee for a temporary period of time without going through the normal procedures. Additionally, plaintiff claims that some employees have been transferred laterally without going through the formal procedures.

In plaintiff's case, MCI required plaintiff to go through the normal posting procedures, although it waived the six-month requirement. In the meantime, the Director of the Chicago Center, Rita Hines Parker ("Hines Parker"), an African-American woman, allowed

Carnes to transfer back to Chicago in her old position of CSP without going through the posting procedures. The transfer took effect March 7, 1995, at which time Carnes was supervised by Dwight Holmes ("Holmes"), an African-American male, who reported to Karen Zygmunt ("Zygmunt").

On February 22, 1995, MCI posted a position for an Initial Trainer in Chicago. Gloodt was responsible for hiring the new Initial Trainer and wanted to hire a person with some experience in initial training or monitoring who could work flexible hours and travel. The hiring [*4] process was done in two stages. Candidates made presentations and, on the basis of these presentations, certain candidates were chosen for interviews. At the presentation stage, Carnes was the highest-scoring candidate and, as a result, was one of five people selected to interview.

By the time Gloodt interviewed plaintiff, she was aware that Carnes was pregnant. Plaintiff claims that, at the interview, Gloodt asked her a question regarding how plaintiff would handle child care issues. Plaintiff also claims that Gloodt asked her about her ability to travel. While Gloodt admits that she asked all of the candidates questions about travel and whether they were able to work flexible hours, she denies asking any questions regarding pregnancy or child care. Plaintiff claims that she complained to superiors about some of the questions that were asked during the interview. [1]

> 1  Plaintiff also claims that she contacted a Human Resources representative in the Atlanta office to complain of discrimination, although she cannot remember the name of the person. There is an absence of evidence to support this allegation.

[*5]  After the interviews were concluded, but before a decision had been reached on whom to hire, MCI decided that the Chicago Center would be given the responsibility of training employees on "Vision" products, a line of products aimed at high-end customers. At the time, the only Chicago trainers versed in "Vision" were on loan to the Houston office. According to defendant, for this reason, Gloodt, Hines Parker, and Laura Meshulam Lustig ("Lustig"), the Manager of Human Resources in Chicago, decided to rescind the original Initial Trainer posting and repost the position making "Vision" experience a requirement. Plaintiff claims that the decision to repost was taken because plaintiff was the highest scorer on the test and, for discriminatory reasons, defendant did not want to give the position to plaintiff. Plaintiff asserts that Gloodt's question regarding child care, as well as the fact that Gloodt could have recalled the trainers on loan to Houston, is evidence of this discrimination.

Gloodt met with plaintiff on March 14, 1995 at 3:15 p.m. to tell plaintiff about the reposting. After the meeting, plaintiff became upset, left the building and went home. At some point in the afternoon, [*6] plaintiff had asked her acting supervisor to sign her off the phones for the rest of the day, although she did not mention to the acting supervisor that she was leaving work early. As a result of her leaving early without permission, Zygmunt decided to issue plaintiff a written warning for violating work rules.

On March 15, 1995, MCI posted the new position, waiving the six-month requirement in order to get applicants with "Vision" experience. Carnes did not apply for the new position. Upon Gloodt's recommendation, MCI gave the position to Eddie Skidmore, a Caucasian male, who, at the time, held the position of Supervisor for Vision CSP's. Subsequently, on April 27, 1995, plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").

On May 22, 1995, Carnes informed MCI that her grandmother had passed away. According to MCI's written policy, an employee may take up to three days of paid leave for a death in the family. However, Carnes did not return to work on May 25, 1995 and did not call her supervisors at MCI to inform them that she would be taking an extra day of leave. [2] When she was confronted about her rule violation, Carnes apologized. [*7] However, after the meeting, plaintiff wrote a memo to Zygmunt, Holmes' supervisor, complaining of how she was treated in regards to the family death. Subsequently, Holmes issued a written warning for taking the unauthorized extra day. Because the warning was less than ninety days old when bonuses were issued, plaintiff was ineligible for her portion of the bonus. She was also not allowed to apply for transfers or promotions during the ninety day period.

> 2  Apparently Carnes did contact another supervisor, Arthur Mitchell, to let him know her whereabouts, although it is unclear when the contact was made and whether Carnes told Mitchell she would be gone for more than three days. In any event, Mitchell is not one of Carnes' supervisors and there is no evidence that Carnes asked or expected Mitchell to convey relevant information to those supervisors.

The Chicago Center closed in the fall of 1995. Some employees accepted jobs at other MCI locations. MCI sent Carnes a letter dated August 3, 1995 in which it offered [*8]  plaintiff the chance to apply for a position with MCI in another one of MCI's locations. Plaintiff declined this opportunity and MCI terminated her employment when the Chicago Center closed.

## PRELIMINARY ISSUE

Along with its reply brief, defendant filed a Local Rule 12(M) statement responding to plaintiff's statement of additional facts. Defendant also submitted a supplemental appendix that contained additional deposition excerpts and a new declaration by Rita Hines Parker. In response, plaintiff filed a motion to strike the Hines Parker declaration and all references to the declaration in defendant's 12(M) statement.

Plaintiff claims that the Hines Parker declaration introduces new evidence at the reply stage and is, therefore, inappropriate. Plaintiff argues that new evidence is brought forth as to two issues: (1) defendant's "loan" policy; and (2) whether Carnes' immediate supervisors knew that plaintiff had complained of discrimination to Hines Parker. Defendant argues that new evidence is appropriate because the "loan" issue was raised for the first time by plaintiff in her response and because the declaration does not raise any new evidence as to the "knowledge" issue.

[*9] Local Rule 12(M) allows the moving party to respond to the non-movant's statement of additional fact. The moving party may not, however, raise new issues in its reply brief. See Fasules v. D.D.B. Needham, Worldwide, Inc., 1989 U.S. Dist. LEXIS 10573, No. 89 C 1078, 1989 WL 105264, at *2 (N.D. Ill. Sept. 7, 1989). Nevertheless, where the non-moving party has herself raised new issues, the moving party must be given the opportunity to respond to these new issues by attaching affidavits or other evidentiary materials. See Baron v. W.W. Grainger, Inc., 944 F. Supp. 689, 692 (N.D. Ill. 1996) ("defendant's submission of supplementary affidavits in support of its responses to plaintiff's additional facts in within the spirit of Rule 12(M)"). To hold otherwise would be to allow the non-movant to raise new issues without affording the movant the opportunity to respond.

In the present case, plaintiff injected the "loan" issue into the case in response to defendant's motion. Prior to that, the "loan" issue did not appear to be central to plaintiff's claim. Therefore, defendant had every right to respond to the issue by filing the Hines Parker declaration. Thus, the court denies plaintiff's motion to strike the [*10] declaration.

The situation is quite different, however, with regard to the "knowledge" issue. This issue had always been a central part of this case and, therefore, defendant had every opportunity to present all of its factual information as to this issue in its initial 12(M) filing. Defendant may not wait until plaintiff has responded to present key evidence. Therefore, the court strikes all references in the Hines Parker declaration as to this issue.

Furthermore, in addition to responding to plaintiff's statement of additional facts, defendant also filed a reply to plaintiff's 12(N) responses. The Local Rules do not provide for such a reply and the court has not considered this submission in its decision.

## STANDARD

According to Rule 56, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). There is no genuine issue of material fact if "the record taken as a whole could not lead a rational trier of fact [*11] to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986). Thus, if the nonmoving party could not prevail on its version of the facts, a trial is unnecessary and summary judgment should be granted. Id. However, the party moving for summary judgment bears the initial burden of proving the absence of a disputed material issue of fact and establishing its right to judgment as a matter of law. NLFC, Inc. v. Devcom Mid-America, Inc., 45 F.3d 231, 234 (7th Cir.), cert. denied, 515 U.S. 1104, 115 S. Ct. 2249, 132 L. Ed. 2d 257 (1995). Additionally, the court views the facts and the inferences to be drawn from the facts in the light most favorable to the non-moving party. Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356. In employment discrimination cases, intent and credibility are often at issue and, therefore, the court applies the summary judgment standard "with added rigor." Sarsha v. Sears, Roebuck & Co., 3 F.3d 1035, 1038 (7th Cir. 1993) (citations omitted).

## ANALYSIS

Plaintiff filed a five count complaint asserting claims of discrimination, harassment, and [*12] retaliation based on both race and sex (pregnancy) discrimination. Defendant has moved to dismiss each count.

## Disparate Treatment

In Counts I and II, plaintiff claims that, by not promoting her, defendant discriminated against her on the basis of race and sex in violation of Title VII and § 1981.[3] Plaintiff believes that her race and/or pregnancy played a role in her not receiving a promotion to the Initial Trainer position after she had transferred back to Chicago. Carnes' theory is that MCI refused to transfer her into the Chicago position without requiring her to go through the formal process because of her race and/or pregnancy. Then, MCI continued to discriminate against

her by reposting the Initial Trainer position in order to make her ineligible for the position.

> 3  Since the elements of a § 1981 claim and the methods of proving such a violation are the same as those for Title VII, the court considers Counts I and II in the same discussion. See Johnson v. City of Fort Wayne, Ind., 91 F.3d 922, 940 (7th Cir. 1996).

[*13]  According to Title VII, it is "an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . race [or] sex." 42 U.S.C. § 2000e-2(a). Through the Pregnancy Discrimination Act, Congress made it clear that the "terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes." Pub. L. No. 95-555, 92 Stat. 445 (codified as amended at 42 U.S.C. § 2000e(k)). Therefore, it is illegal to discriminate against an employee or a job applicant on the basis of race or pregnancy.

Nevertheless, "the federal anti-discrimination laws do not authorize judges to 'sit as a kind of 'super-personnel department' weighing the prudence of employment decisions. . . . '" Gleason v. Mesirow Fin., Inc., 118 F.3d 1134, 1139 (7th Cir. 1997) (quoting Giannopoulos [*14]  v. Brach & Brock Confections, Inc., 109 F.3d 406, 410 (7th Cir. 1997)). The question the parties must address in a discrimination case is not whether the employer made a wise decision in taking adverse action against an employee or job applicant, but "whether the employer would have taken the same action had the employee been of a different race [or had the employee not been pregnant] and everything else had remained the same." Carson v. Bethlehem Steel Corp., 82 F.3d 157, 158 (7th Cir. 1996). In other words, race and/or pregnancy may not be a motivating factor for an employment decision, even if it was only one of a number of motivating factors. Geier v. Medtronic, Inc., 99 F.3d 238, 241 (7th Cir. 1996) (quoting 42 U.S.C. § 2000e-2(m)). To show discrimination, plaintiff may rely on direct evidence of discriminatory intent or indirect evidence. See Helland v. South Bend Community School Corp., 93 F.3d 327, 329 (7th Cir. 1996), cert. denied, 136 L. Ed. 2d 715,    U.S.   , 117 S. Ct. 769 (1997) (citations omitted).

**Direct Evidence**

Direct evidence is generally "evidence which in and of itself suggests that the person or persons with the power [*15]  to hire, fire, promote and demote the plaintiff were animated by an illegal employment criterion." Venters v. City of Delphi, 123 F.3d 956, 1997 WL 471341, at *13 (7th Cir. 1997). The evidence suggesting discriminatory motives must be tied to the adverse employment action. Id. Nevertheless, the decision maker need not come out and say, "I will not hire a pregnant or black woman," in order for there to be direct evidence. Instead, the plaintiff may introduce evidence that shows "a propensity" on the part of the employer to consider improper factors in making the employment decision. Id. (citations omitted). Such circumstantial evidence may include ambiguous statements or suspicious timing. See Geier, 99 F.3d at 241 (citing Troupe v. May Dep't Stores Co., 20 F.3d 734 (7th Cir. 1994)). If plaintiff's evidence proves that pregnancy or race was a motivating factor in the employer's decision, the burden then shifts to defendant to show by a preponderance of the evidence that the same employment decision would have been made even if the improper criteria had not been considered. Price Waterhouse v. Hopkins, 490 U.S. 228, 258, 109 [*16]  S. Ct. 1775, 1795, 104 L. Ed. 2d 268 (1989) (plurality); id. at 259-60, 109 S. Ct. at 1795 (White, J., concurring); id. at 261, 109 S. Ct. 1796 (O'Connor, J., concurring). However, such a showing by the employer would not completely eliminate the employer's liability, but would merely limit the remedies available to plaintiff.  42 U.S.C. § 2000e-5(g)(2)(B); see also Hairston v. AT&T, 1995 U.S. Dist. LEXIS 12637, No. 94 C 1213, 1995 WL 519983, at *1 n.2 (N.D. Ill. Aug. 30, 1995) (noting that the Civil Rights Act of 1991 overruled Price Waterhouse to the extent that case held that the employer could avoid liability completely by proving it would have taken the same adverse action even if it did not have a discriminatory motive).

Plaintiff believes that, in regards to the pregnancy discrimination claim, she can show direct evidence of discrimination. [4] According to plaintiff, at the interview for the Initial Trainer position, Gloodt asked her a question regarding how plaintiff would handle child care issues and her ability to travel. Plaintiff argues that this line of questioning proves that the Chicago decision-makers considered plaintiff's pregnancy in the decision not to transfer plaintiff without [*17]  going through formal posting procedures and then again in the decision not to promote her. While Gloodt denies asking a question about child care during the interview, at the summary judgment stage, the court must resolve all factual issues in favor of the non-movant. Therefore, for purposes of this motion, the court presumes that Gloodt asked this question.

4    Plaintiff presents no direct evidence of dis-crimination based on race. As such, the court finds that plaintiff has failed to meet her burden on this issue.

Questioning a potential employee about her ability to travel is not unreasonable. Many potential employees would have trouble putting aside their personal lives in order to travel for many different reasons. Similarly, an employer is permitted to ask potential employees about their family and child care situations. See Bruno v. City of Crown Point, Ind., 950 F.2d 355, 362 (7th Cir. 1991), cert. denied, 505 U.S. 1207, 112 S. Ct. 2998 (1992). "An employer is not required to ignore an applicant's [*18] family and family responsibilities." Id. However, the questions must be asked to all applicants, male and fe-male, "in a neutral, non-discriminatory manner." Id. The employer may not assume that women will have a greater burden in providing child care or that family con-cerns will conflict with a woman's job responsibilities any more than a man's. Id.

In the present case, there is no direct evidence that the decision makers considered Carnes' pregnancy when they decided to require Carnes to go through the formal posting in order to transfer to the Initial Trainer position in Chicago. Furthermore, while, for purposes of this mo-tion, the court presumes that Gloodt asked Carnes about child care, the nature of that question is unclear. Carnes states only that Gloodt asked some question about child care. Carnes Dep. at 107. It may be that this comment was nothing more than a "stray remark" having nothing to do with the employment decision. See Venters v. City of Delphi, 123 F.3d 956,  , 1997 WL 471341, at *13 (7th Cir. 1997) (inappropriate, but isolated comment having no relationship to the employment decision is not direct evidence [*19] of discrimination). More impor-tantly, however, there is no evidence in the record show-ing that Gloodt did not ask all of the interviewees who had children, male and female, about child care in the context of inquiring about flexible hours and travel. Plaintiff has failed to present evidence from other inter-viewees stating that such a question was not asked. If she had found one interviewee who had a small child and was not asked a question about child care, particularly if she had found a similarly-situated male interviewee who was not asked such a question, plaintiff would have cre-ated a genuine issue of fact. See Geier, 99 F.3d 238 at 242-43 (plaintiff who claims supervisor acted inappro-priately toward her cannot directly prove discrimination without showing that supervisor acted differently toward other nonpregnant employees). It may be that there were no other interviewees with small children, thus making it impossible for plaintiff to show that other interviewees were not asked about child care. However, if this were the case, "it was incumbent on [plaintiff] to raise the im-

possibility of this evidence to the Court's notice." Id. at 243.

In conclusion, the court finds that [*20] plaintiff has not sustained her burden of showing direct evidence. Based on Carnes' testimony alone, no reasonable jury could find that plaintiff's pregnancy was a motivating factor in the hiring decision.

**Indirect Evidence**

If the plaintiff cannot show direct evidence of dis-crimination, the plaintiff may rely on the burden-shifting method articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), to prove discrimination indirectly. Under this method, once the plaintiff shows a prima facie case of discrimination, by a preponderance of the evidence, the burden shifts to defendant to give a legitimate, nondis-criminatory reason for its actions. Plair v. E.J. Brach & Sons, Inc., 105 F.3d 343, 347 (7th Cir. 1997); Helland, 93 F.3d at 329. If the defendant articulates a nondis-criminatory reason, then the plaintiff must establish that the proffered reason is pretextual. Plair, 105 F.3d at 348; Helland, 93 F.3d at 329-30 (citations omitted).

To establish a prima facie case of failure to promote, plaintiff must show that: (1) she belongs to some pro-tected class; (2) she applied for a position for which she was [*21] qualified; (3) she was rejected for the posi-tion; and (4) the position went to someone whose race or sex was different from plaintiff, but who had similar or lesser qualifications. Von Zuckerstein v. Argonne Nat'l Lab., 984 F.2d 1467, 1472-73 (7th Cir.), cert. denied, 510 U.S. 959, 114 S. Ct. 419, 126 L. Ed. 2d 365 (1993). Plaintiff, an African-American who was pregnant during the relevant time frame, has clearly shown the first prong. Additionally, plaintiff was rejected for the posi-tion and it did go to a Caucasian male.

The true issue then is whether plaintiff was qualified for the position. Plaintiff argues that, since she was al-ready an Initial Trainer in Texas, she was qualified for the Initial Trainer position in Chicago. Additionally, she believes that she was qualified for an automatic transfer from her position in Texas to the Initial Trainer position in Chicago. Defendant argues, however, that Carnes was not qualified for an automatic transfer since employees are not permitted to transfer without going through for-mal procedures and that she was not eligible for the Ini-tial Trainer position since she did not have "Vision" ex-perience.

Turning first to whether plaintiff [*22] was quali-fied for an automatic transfer, the court finds that there is no genuine issue of material fact -- Carnes was not quali-fied. Plaintiff has presented no evidence to contest the fact that MCI did not generally allow transfers from one

office to another without going through formal procedures. Def.'s 12(M) Statement P 10; Pl.'s 12(N) Response P 10(e). Plaintiff does state that MCI "allowed employees to transfer or move to another location 'on loan' whenever it saw fit to do so." Pl.'s 12(N) Response P 10(c). Nevertheless, it is clear by the evidence cited by plaintiff that "loans" were intended to be temporary. Gloodt Dep. at 46-48. Plaintiff did not request a temporary transfer; she requested a permanent move. Since the "loan" practice would not have afforded Carnes a permanent transfer, the issue is irrelevant.

Plaintiff also claims that there were employees who were permanently transferred without going through formal procedures. However, while plaintiff does make a conclusory statement that such transfers occurred, see Carnes Aff. P 3, plaintiff has not provided any hard evidence that such transfers occurred. In support, Carnes lists a series of people who transferred [*23] from Chicago to Texas. Carnes Dep. at 66-70. However, plaintiff does not have direct knowledge of the circumstances surrounding these transfers. For instance, when asked at her deposition how she knew that one of the employees had transferred without formal process, Carnes stated that she knew the information "just through general conversation." Id. at 68. This statement is therefore based on inadmissible hearsay. Furthermore, since plaintiff sought a transfer to Chicago and since Chicago did its own hiring, plaintiff would need to point to evidence showing that there were employees who transferred to the Chicago office without going through formal procedures. Plaintiff has not produce any such evidence; all of the alleged transfers were from Chicago to Texas. Therefore, plaintiff cannot show that she was qualified for an automatic transfer to the Chicago office.

The issue of whether plaintiff was qualified for the Initial Trainer position is a more difficult question. Plaintiff did not have any significant "Vision" experience as required by the second posting. However, plaintiff's argument is that the first posting was withdrawn, and the "Vision" requirement added, specifically [*24] to avoid having to promote plaintiff. Therefore, the issue is whether plaintiff was qualified for the position for which she applied -- the first posting. On the record, it appears that she was. Plaintiff had a good record at MCI, was the highest scorer on the presentation, Def.'s 12(M) Reply P 141, and had already been hired as an Initial Trainer in the Texas office. There is at least a genuine issue of material fact as to whether she was qualified. Therefore, the court finds that plaintiff has shown a *prima facie* case for purposes of this motion as to her promotion claim.

The burden now shifts to defendant to show a legitimate, non-discriminatory reason for not hiring plaintiff. According to defendant, before Gloodt could make a final decision on which person to hire for the Initial

Trainer position, MCI made a decision that resulted in the Chicago Center having to train twenty to thirty-five new employees as Vision CSP's. Def.'s 12(M) Statement P 25. Since this was an important project that needed to be completed quickly, Gloodt decided that it was important to have someone with "Vision" experience. Id. P 26. Neither Carnes nor any of the other candidates who made it to [*25] the interview stage had such experience. Id. P 27. Therefore, according to defendant, Gloodt, Lustig and Hines decided to withdraw the initial posting without hiring any of the candidates for the position and to repost the position requesting someone with "Vision" experience. Id.

Having articulated a legitimate, non-discriminatory reason for not hiring plaintiff, the burden shifts back to plaintiff to show that defendant's stated reason is pretextual. In essence, plaintiff must show that MCI's stated reason is not the true reason for its decision to repost the position. "Pretext . . . means a lie, specifically a phony reason for some action." Russell v. Acme-Evans Co., 51 F.3d 64, 69 (7th Cir. 1995). Thus, it would not be enough for plaintiff to show that defendant's choice to require "Vision" experience was misguided. Instead, plaintiff would need to show that the Chicago Center did not, in fact, have a pressing need to train people in "Vision" or that the need for someone with "Vision" experience was not the true reason for deciding not to hire Carnes.

Plaintiff attempts to show pretext by pointing to the question concerning child care in the initial interview. However, [*26] the alleged question about child care only creates some question about whether Gloodt was concerned that Carnes was pregnant, not that MCI is lying about needing to hire someone with "Vision" experience. Plaintiff also argues that she could have learned "Vision" quickly. However, this also is not evidence of prevarication. Even if she could have learned quickly, that only goes to the issue of whether MCI made a proper business judgment. "An employers decision does not have to be wise, prudent or logical; it merely has to be explained clearly and applied indiscriminately." Bruno v. City of Crown Point, Indiana, 950 F.2d 355, 364 (7th Cir. 1991). In other words, even if MCI did not have a legitimate need to hire someone with "Vision" experience, as long as the decision-makers believed that they did have this need, plaintiff could not prove discrimination. See Helland, 93 F.3d at 330 (discrimination claim rejected where defendant believed negative evaluations were correct, even though plaintiff challenged the accuracy of the reports). Since plaintiff has pointed to no evidence suggesting that MCI is lying about its reason for not promoting plaintiff, there is no inference raised [*27] that the true reason for failing to promote Carnes was her race or sex (pregnancy). There being no genuine issue of material fact as to pretext, the court grants summary

judgment in favor of defendant on the discrimination charges.

## HARASSMENT

In Count III, plaintiff claims that, once her supervisors at MCI found out she was pregnant, they began to harass her. [5] Plaintiff claims that the harassment can be seen in six different examples. First, plaintiff alleges that, after she announced she was pregnant, Homes required her to ask permission before using the restroom. Second, on one occasion, Holmes referred to plaintiff as "the whining pregnant lady." Third, plaintiff received a written warning for leaving work early after finding out she would not get the Initial Trainer position. Fourth, plaintiff was issued a final written warning after plaintiff took an extra day of bereavement leave without informing her supervisors. Fifth, as a result of receiving a written warning, plaintiff was denied her share of bonus pay. Finally, plaintiff claims that Holmes falsely accused her of switching a customer to MCI from another telephone service without customer approval. Defendant [*28] argues that these incidents do not rise to the level of pregnancy harassment and that, even if they did, plaintiff is barred from raising them because she failed to include claims of harassment in her EEOC charge.

> 5 There is an issue as to whether Title VII recognizes a cause of action for pregnancy harassment. However, since neither party has raised this issue and since at least two courts have found that pregnancy harassment is a cause of action, see Mentch v. Eastern Sav. Bank, FSB, 949 F. Supp. 1236, 1245-46 (D. Md. 1997); Donaldson v. American Banco Corp., Inc., 945 F. Supp. 1456, 1461 (D. Colo. 1996), the court assumes, for purposes of this case only, that such a cause of action exists.

The court turns first to the issue of whether plaintiff's claim of harassment was raised before the EEOC. Usually, a plaintiff must have raised the issue before the EEOC in order for it to be considered properly brought before the federal district court. See Harper v. Godfrey Co., 45 F.3d 143, 147-48 (7th Cir. [*29] 1995). The reason for this requirement is to give notice to the employer of the accusations brought against it and to afford the EEOC an opportunity to settle the dispute. See id. (citations omitted); Cheek v. Western and S. Life Ins. Co., 31 F.3d 497, 500 (7th Cir. 1994) (citations omitted).

However, this requirement is not jurisdictional, but is rather a condition precedent that the plaintiff must satisfy. Cheek, 31 F.3d at 500 (citations omitted); Babrocky v. Jewel Food Co. & Retail Meatcutters, 773 F.2d 857, 864 (7th Cir. 1985). Since most EEOC charges are filed *pro se*, the Seventh Circuit has held that "a Title VII

plaintiff need not allege in an EEOC charge each and every fact that combines to form the basis of each claim in her complaint." Cheek, 31 F.3d at 500 (citation omitted). To bring a claim in district court that was not raised in the EEOC charge, a plaintiff must show that: "(1) the claim is like or reasonably related to the EEOC charges, and (2) the claim in the complaint reasonably could develop from the EEOC investigation into the original charges." Harper, 45 F.3d at 148 (citing Jenkins v. Blue Cross Mut. Hosp. Ins., Inc., 538 F.2d [*30] 164, 167 (7th Cir.) (en banc), *cert. denied*, 429 U.S. 986, 97 S. Ct. 506, 50 L. Ed. 2d 598 (1976).

In the present case, plaintiff's EEOC charge reads in relevant part:

> On March 14, 1995 I was informed by Respondent that I had not been selected for the Initial Trainer position. On March 15, 1995 I was given a written warning. . . . Respondent's reason for the written warning was for an alleged unexcused absence. . . . I believe that I have been discriminated against because of my race, black, and sex, female (pregnancy) . . . in that shortly after Respondent learned of my pregnancy a non-black was hired into the Initial Trainer (Chicago) position for which I was qualified and had held in Houston, TX; and I was written up for an alleged unexcused absence.

The charge does not mention harassment at all. Reasonably viewed, the charge speaks only in terms of discrimination. Therefore, the court must decide whether plaintiff has shown that the claim is "like or reasonably related to the EEOC charges" and whether the information put forth in the charge could have reasonably been uncovered by the EEOC investigation into the original charges. [6] Id.

> 6 The court notes that, in her response brief, plaintiff has failed to respond to defendant's argument that the EEOC charge does not mention harassment.

[*31] For the charges to be alike or reasonable related, "the EEOC charge and the complaint must, at minimum, describe the same conduct and implicate the same individuals." Cheek, 31 F.3d 497. In the charge, plaintiff mentions nothing about having to ask permission before using the restroom, Holmes referring to her as "the whining pregnant lady," the final written warning, the denial of a bonus, or Holmes falsely accusing her of switching a customer. In fact, all but one of the incidents

giving rise to the alleged harassment took place after the March 14, 1995 date listed in the charge as the last day of discrimination. Furthermore, most of the alleged harassment listed in the complaint involved Holmes. However, while the one incident that is listed in both the charge and the complaint, the issuance of a written warning to plaintiff for leaving work early, did involve Holmes, it was actually Zygmunt who ordered the written warning. Def.'s 12(M) Statement P 36. Thus, most of the allegations of harassment involved a time period that is later than the period Carnes listed in the EEOC charge, involved a different type of discrimination, and involved different people. As such, the court [*32] finds that each incidence of alleged harassment, with the exception of the first written warning, is not "like or reasonably related to the EEOC charge" and is, therefore, not actionable in district court. See Malhotra v. Cotter & Co., 885 F.2d 1305, 1312 (7th Cir. 1989) (where EEOC charge pertained to earlier time period, a different form of discrimination, and involved different employees than asserted in complaint, action under Title VII was barred).

Turning next to the merits of plaintiff's harassment charge, the court finds that, based on the facts presented, no reasonable jury could find that plaintiff was the victim of pregnancy harassment. Under Title VII, an employee has "the right to work in an environment free from discriminatory intimidation, ridicule, and insult." Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65, 106 S. Ct. 2399, 2405, 91 L. Ed. 2d 49 (1986). Isolated comments regarding pregnancy which the listener would find offensive do not rise to the level of harassment. See Gleason, 118 F.3d at 1143 (quoting Rennie v. Dalton, 3 F.3d 1100, 1107 (7th Cir. 1993), cert. denied, 510 U.S. 1111, 114 S. Ct. 1054, 127 L. Ed. 2d 375 (1994)). "For [pregnancy] [*33] harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" Meritor, 477 U.S. at 67, 106 S. Ct. at 2405 (quoting Henson v. Dundee, 682 F.2d 897, 904 (11th Cir. 1982)).

The one remaining allegation of harassment -- that plaintiff was given a written warning for leaving work early after she heard she had not been promoted -- certainly does not rise to the level of "severe or pervasive." While plaintiff did ask her acting supervisor to sign her off the phones for the rest of the day, Pl.'s 12(N) Response P 35, there is no evidence in the record that plaintiff informed the supervisor that she was leaving work early. Therefore, this court is not in a position to say that MCI's issuance of a written warning was done in order to harass plaintiff. Plaintiff broke the rules. Even if, as plaintiff contends, defendant treated plaintiff more harshly than other employees in similar circumstances, see Pl.'s Mem. at 12, no reasonable trier of fact could

find that this constituted "severe or pervasive" harassment. This is especially true in light of Seventh Circuit precedent, [*34] which holds that there is "a safe harbor for employers in cases in which the alleged harassing conduct is too tepid or intermittent or equivocal to make a reasonable person believe that she has been discriminated against." Galloway v. General Motors Serv. Parts Operations, 78 F.3d 1164, 1168 (7th Cir. 1996).

Finally, even if the court decided not to bar all of the other allegedly harassing behavior on procedural grounds, no reasonable jury could find that Carnes was harassed. While plaintiff claims that Holmes required her to ask permission in order to go to the bathroom, the evidence is uncontested that employees were required to be at their desks except for two fifteen-minute breaks and lunch. Holmes Dep. at 73. Although Holmes allowed employees to go to the bathroom at other times, id. at 72, it is not harassment to require an employee to ask permission before going to the bathroom. Plaintiff has not introduced evidence to show that she was the only employee required to ask permission, and, even if she was, there is no evidence to suggest that permission was ever denied or that the situation was handled in a denigrating fashion.

As to the written warning for taking an [*35] extra day of bereavement, plaintiff admits that defendant has a rule allowing for only three days of bereavement leave, Pl.'s Mem. at 12, and that requests for an additional day off would need to be made in advance. Def.'s 12(M) Statement P 47. While plaintiff did contact a supervisor regarding her whereabouts during her leave, Pl.'s 12(N) Response P 89, she did not contact any of her own supervisors. Thus, no reasonable jury could find that plaintiff was being harassed by being given a written warning for taking an extra day of bereavement leave.

The other claims do not constitute "sever and pervasive" harassment even in combination with the above actions. Plaintiff admits that an employee who receives a written warning is barred from bonuses for ninety days. Pl.'s 12(N) Statement of Additional Facts P 85. Since, as discussed above, the written warnings were properly issued, the denial of a bonus is not harassment. Next, while plaintiff claims that Holmes falsely accused her of switching a customer to MCI from another telephone service without customer approval, after Carnes explained the situation, the issue was dropped and no disciplinary action was taken. Def.'s 12(M) Statement [*36] P 63. In other words, Holmes investigated the complaint and cleared plaintiff's name. This is not harassment. Finally, an isolated incident of Holmes calling Carnes "the whining pregnant lady" cannot be considered so "severe and pervasive [so as] to alter the conditions of employment and create an abusive working environment." Meri-

tor, 477 U.S. at 67, 106 S. Ct. at 2405 (quotation omitted). [7]

> 7    Plaintiff's only evidence of Holmes having made this statement came from a co-employee who told plaintiff that Holmes had made the statement. This is classic hearsay which the court may not consider on summary judgment. See Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560, 562 (7th Cir. 1996) (citing Wigod v. Chicago Mercantile Exch., 981 F.2d 1510, 1518-19 (7th Cir. 1992)).

In harassment cases, the court must look to see if the environment was "hostile or deeply repugnant" as opposed to "merely unpleasant." Gleason, 118 F.3d at 1144 (quoting Baskerville v. Culligan Intern. Co., 50 F.3d 428, [*37] 431 (7th Cir. 1995)). Here, considering the record as a whole, no reasonable trier of fact could find that MCI created an atmosphere that was hostile. Carnes may not have liked the fact that MCI held to the company's policies and the company may have even applied the rules more strictly with Carnes. However, considering the fact that Carnes left work early and took an extra day of leave without consulting her superiors, no reasonable jury could find that the warnings were unjustified. Nor could any reasonable trier of fact find that the other alleged actions were anything more than nuisances rather than pervasive and severe.

As a final issue, the court notes that the only alleged action of harassment that Carnes mentioned to her superiors was the written warning for having returned one day late from bereavement leave. Pl.'s 12(N) Response P 64. While Carnes also claims that she complained to a human resources person, she cannot remember with whom she talked or the date of the conversation. Carnes Dep. at 133. As such, plaintiff has offered no evidence to suggest that her superiors knew of the alleged harassment, especially the alleged harassment by Holmes. The Seventh Circuit [*38] has recently made it clear that "hostile work environment" claims are to be judged by a negligence standard. See Jansen v. Packaging Corp. of America, 123 F.3d 490, 502 (7th Cir. 1997) (Flaum, separate opinion). Although what constitutes due care may be different in the case of harassment by a supervisor, see id., in this case, plaintiff has stated that she knew she could contact human resources in the Atlanta office to complain, but failed to do so (or she did, but cannot prove as such). Therefore, the court finds that MCI was not on notice as to the alleged harassment, had no reason to know of the alleged harassment and, thus, cannot be held liable for pregnancy harassment. Summary judgment is granted in favor of defendant.

## RETALIATION

In Counts IV and V, plaintiff claims that defendant retaliated against her for filing an EEOC charge and for speaking up against alleged pregnancy discrimination. Title VII prohibits an employer from retaliating against an employee who voices opposition to illegal discriminatory conduct. 42 U.S.C. § 2000e-3(a). Plaintiff attempts to show retaliation via the McDonnell Douglas framework. Under that framework, to establish a [*39] prima facie case of retaliation, plaintiff must show that: "(1) the plaintiff engaged in a protected activity under Title VII; (2) he suffered an adverse action by his employer; and (3) there is a causal link between the protected expression and the adverse action." Kipnis v. Baram, 949 F. Supp. 618, 624 (N.D. Ill. 1996).

In the present case, plaintiff claims that MCI retaliated against her by: (1) requiring her to ask permission before using the bathroom; (2) giving her a written warning on March 15, 1995 for leaving work early; and (3) giving her a final written warning on June 5, 1995 for having taken an extra day of bereavement leave without permission. Defendant asserts that these reasons do not rise to the level of "adverse action" and, therefore, plaintiff cannot make out a prima facie case.

In order for an employment action to be retaliatory, it must be material. According to the Seventh Circuit:

> [A] materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced [*40] by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.

Rabinovitz v. Pena, 89 F.3d 482, 488 (7th Cir. 1996) (quoting Crady v. Liberty Nat'l Bank & Trust Co., 993 F.2d 132, 136 (7th Cir. 1993)). In the present case, the requirement to ask permission before going to the restroom certainly does not rise to a material adverse change. The written warnings, however, present a more difficult issue.

Plaintiff argues that, by giving her written warnings, the company prevented her from receiving a bonus and from applying for other positions within MCI. This is because, under MCI rules, an employee is prevented from receiving a bonus and applying for other MCI positions for ninety-days after receiving a written warning. Pl.'s 12(N) Response P 85. Though it is unclear whether

plaintiff was harmed by the first written warning (and, thus, this remains a question of fact), plaintiff does assert that, as a result of the second written warning, she was denied a bonus and was prevented from applying for an Initial Trainer position that [*41] came open during the ninety-day period. Pl.'s Mem. at 18. Although the loss of a discretionary bonus is not enough to be considered materially adverse, see Rabinovitz, 89 F.3d at 488-89, in this case, it is unclear whether the bonus was discretionary or automatic. In addition, the court finds that the loss of the opportunity to apply for the Initial Trainer position, a position that plaintiff was eager to secure and for which she was qualified, did materially harm plaintiff.

However, even if plaintiff proves all three elements of the *prima facie* case at trial, plaintiff's claim would still fail. Defendant has offered legitimate, nondiscriminatory reasons for the two written warnings. Plaintiff, on the other hand, has not put forth any evidence to show that defendant's proffered reasons are merely pretext for discrimination.

According to MCI, plaintiff was given the March 15, 1995 warning because she left work early without permission. Def.'s 12(M) Statement P 35. On March 14, 1995, Carnes approached her acting Vision Supervisor Eddie Skidmore and requested that he sign her off the phones for the rest of the day (from 3:15 p.m. to 4:45 p.m.) in order to attend a meeting [*42] with Gloodt. Holmes Dep. Ex. 1. However, when Skidmore called Gloodt to confirm the meeting, he found out that the meeting had finished before 3:15 p.m. Id. The company found out the next day that Carnes had gone home after meeting with Gloodt. Id.

For the most part, plaintiff's version of the facts comport with defendant's. In her affidavit, she states that, "after my meeting with Gloodt, I asked Eddie Skidmore . . . to sign me off the phones for the day. I had intended to also speak with Rita Hines and Art Mitchell about my promotion denial and the discriminatory questioning of Gloodt that day, but neither of them could be located." Carnes Aff. P 7. Plaintiff does not state that she told her supervisor, at any point, that she was leaving early. In fact, she specifically states that she called Arthur Mitchell, a supervisor (although not plaintiff's supervisor) on the evening of March 14, 1997 in order to discuss the events of the previous two days and to tell him that she had gone home. Carnes Dep. at 149. According to Carnes, "I knew that someone needed to be informed about my whereabouts." Id. Furthermore, while plaintiff claims that she did not lie to Skidmore, stating [*43] that she requested that he sign her off of the phones after meeting with Gloodt, Carnes admits that she left work "because quite naturally [she] felt disappointed with the way the whole [transfer] process had transpired." Id. at 148. While plaintiff's version of the facts may or may not

be more accurate, defendant asserts that, at the time plaintiff was disciplined, her supervisors believed she had left work without permission. This is a legitimate, nondiscriminatory reason for disciplining plaintiff.

To survive summary judgment, plaintiff must offer evidence that defendant's proffered reason is pretextual. Essex v. United Parcel Serv., Inc., 111 F.3d 1304, 1309-10 (7th Cir. 1997). Pretext may be shown through direct evidence of discriminatory intent or through evidence that defendant's proffered reason "is unworthy of credence," thus suggesting that prejudice was the true reason for the adverse employment action. Id. at 1310 (citations omitted). The single question regarding child care during the interview for the Initial Trainer position is not enough direct evidence for a reasonable trier of fact to find pretext. Therefore, plaintiff must put forth some evidence [*44] suggesting that defendant has lied regarding the reason for the warning. However, plaintiff has not made such a showing. While plaintiff argues that defendant acted more harshly toward plaintiff than toward other employees by issuing a written warning after plaintiff left work early, she has presented no evidence showing that similarly-situated employees were ever treated differently.

Defendant also contends that the June 5, 1995 warning was issued because Carnes took an extra day of bereavement leave after her grandmother died without requesting the additional day in advance. Def.'s 12(m) Statement PP 47-52. Plaintiff admits that she violated company policy by taking this extra day of leave. Pl.'s Mem. at 12. However, plaintiff contends that she was treated much more harshly than she would have been had she not been black and/or pregnant. As evidence, she cites the fact that Holmes felt sorry for Carnes and that he "felt like the Grim Reaper" for having to discipline plaintiff. Holmes Dep. at 164. Additionally, plaintiff claims that it is suspicious that Holmes was not involved in the disciplinary decision. See id. at 196. While this does show that Holmes, given the choice, may [*45] not have disciplined plaintiff (the decision was made by Senior Manager Ken Castleberry, an African-American, and Zygmunt), and that, unlike in other situations, Holmes input was not considered, there is no evidence that plaintiff was treated unfairly or that the proffered reason was not the actual reason. Again, plaintiff has not offered any evidence of other employees, similarly-situated, who were treated more leniently after taking an extra day of leave -- bereavement, personal, sick, or vacation -- without permission. Thus, there is no genuine issue of material fact as to pretext and defendant is entitled to judgment as a matter of law.

## CONCLUSION

1997 U.S. Dist. LEXIS 19574, *

In conclusion, the court grants plaintiff's motion to strike in part and denies the motion in part. Defendant's motion for summary judgment is granted as to all claims. The court enters judgment in favor of defendant.

**IT IS SO ORDERED.**

Harry D. Leinenweber, Judge

United States District Court

Dated: December 3, 1997